G. W. COLE CO. v. AMERICAN CEMENT & OIL CO. et al.

(Circuit Court of Appeals, Seventh Circuit. April 12, 1904.)

No. 983.

1. TRADE-MARKS—INFRINGEMENT AND UNFAIR COMPETITION DISTINGUISHED.

Unfair competition is distinguishable from infringement of a trade-mark, in that it does not necessarily involve the question of the exclusive right of another to the use of the name, symbol, or device copied or imitated. A word may be purely generic or descriptive, and so not capable of becoming an arbitrary trade-mark, and yet there may be an unfair use of it which will constitute unfair competition.

2. SAME—INFRINGEMENT.

A trade-mark for an oil compounded from a secret formula, and used for a lubricant, rust preventer, and a polish, consisting of the words "Three in One" printed in black letters, and the picture of the figure "1" in red on a white background, upon which are superimposed in white the figure "3" and the word "in," is not infringed by a trade-mark used for a similar oil consisting of the words "Big Four" in red, and the picture of a large figure "4" in blue, superimposed upon a rectangular background in red, containing other descriptive words in blue and white letters.

3. SAME—UNFAIR COMPETITION.

The fact that a defendant which had been engaged in the manufacture and sale of oil in bottles for 20 years adopted for a new product a label wholly distinctive from those previously used is no evidence of a fraudulent intention to compete unfairly with complainant, which had placed on the market a similar article, where its prior labels were also distinctive from each other, and the new product was different in quality from any it had previously made.

4. SAME.

The law of unfair competition seeks only to restrain fraudulent practices inducing confusion of goods and deception of the public, and it cannot be used to prevent a defendant from adopting a trade-mark or label intended to attract attention and popularize its product, although it results, and is intended to result, in better enabling it to compete with complainant, where no deception or confusion of goods is caused or intended thereby.

5. SAME.

The fact that a defendant has been, and still is, a large purchaser of an article made by complainant as a jobber, does not create any trust relation between them which precludes it from placing on the market a competing article of its own manufacture.

6. SAME.

That defendant issued a circular advertising an article of its manufacture to some extent similar to one issued by complainant, and inclosed in the cartons containing its goods, does not constitute unfair competition, where defendant's circulars are not so inclosed, and are sent only to jobbers, and do not come into the hands of retail purchasers.

7. SAME.

Labels and cartons used by complainant and those subsequently adopted by defendant compared, and *held* not to show such similarity as to charge defendant with unfair competition.

8. SAME.

Unless a defendant adopts means calculated to injure complainant through unfair competition, the intention is immaterial; there being no ground for relief where there has been no injury.

Appeal from the Circuit Court of the United States for the Northern District of Illinois.

¶ 1. Unfair competition, see notes to Scheuer v. Muller, 20 C. C. A. 165; Lare v. Harper & Bros., 30 C. C. A. 376.

In the year 1894 the firm of G. W. Cole & Co. began the manufacture of a compound oil according to a secret formula. The oil was a lubricant, rust preventer, and polish. They adopted as a trade-mark and name the designation "Three in One," cast in the form of a large figure "1" in red, upon which was superimposed in white the numeral "3" above the word "in." This cipher was later molded in the glass of the bottles containing the compound. The device was new, the product largely advertised, met with large sales, and became well known throughout the country under the name of "Three in One," identified by that name and by the distinctive device stated. The bottles were inclosed in pasteboard cartons, which bore conspicuously upon the front panel a picture of the bottle inclosed therein; the conspicuous colors being red, black, and greenish yellow upon a white background. For some time a circular had been inclosed in each carton, which consists of pictures of various articles, typewriters, skates, guns, phonographs, etc., for which the preparation is intended, accompanied with descriptive and commendatory notices. The appellant here (complainant below) was organized as a corporation, and succeeded to the business of the copartnership, taking over its assets and good will. The appellant does not sell at retail, but supplies its product to wholesalers and jobbers in the various cities in the country, who in turn furnish the article to the retailer.

The appellee the Excelsior Supply Company, of which the appellee George T. Robie is president, deals in bicycle parts and sundries in the city of Chicago. The appellee the American Cement & Oil Company, of which Mr. Robie is president, manufactures lubricating and other oils and cement. The Excelsior Supply Company for some four or five years has acted as a jobber, and has been a customer of the appellant, purchasing at wholesale its oil, and has sold large quantities of this product, "Three in One," and still continues so to act and sell. In the year 1901 the appellees (defendants below) put upon the market a compound oil called "Big Four," claimed to be identical in color and odor with "Three in One," and put up in bottles claimed to be of the same general design and appearance, but of slightly larger size, the labels of which are claimed to be a close approximation to the appellant's label. The bottles are inclosed in pasteboard cartons, with a picture of the bottle on the outside claimed to closely simulate the carton of the appellant; the label of the appellees having a white background, and a large figure "4" in blue superimposed upon a rectangular red background, and the word "Big" in white superimposed upon the figure "4." An advertising circular was also put out by the appellees, somewhat similar in design to the advertising circular of the appellant, containing 19 different cuts, as against 17 in appellant's circular; four of the cuts in the one being identical with the cuts of the other circular, and many of the others resembling the cuts in the circular of the appellant. The Excelsior Supply Company had been in the manufacture and sale of oils of various kinds for a quarter of a century, and had during that time used different names therefor. The bottles, labels, and style of the "Big Four" product were a radical departure from anything previously used by it. The bottle used by the appellant, containing its compound, holds 3 ounces, is 5½ inches in height, 1⅞ inches in width, and 1⅛ inches in thickness, the neck being 1 inch in length, and both surfaces flat. It is of special mold, and not an ordinary stock bottle. It has blown in the glass on one edge "G. W. Cole Co.," and on the other edge "Three in One." The bottle used by the appellees holds 4 ounces, is 5⁶/₈ inches in height, 2 inches in width and 1⅜ in thickness at its broadest part, and the neck of the bottle is 1¼ inches in height, the front surface being convex. The bottle is known in the trade as a "4-ounce Blake oval bottle," and is a stock bottle manufactured by nearly every bottle factory in the country. In the autumn of 1901 the appellant began to put up a small 1-ounce package—a duplicate of its larger one, except as to size. In the winter following the appellees also put up a 1-ounce package, but without knowledge that the appellant had so done, using these small bottles simply as samples. They are not regularly sold. All of these kinds of bottles had been used by the appellees in their business for years before they had any dealings with the appellant.

A better idea of the two labels may be had by a comparison, and they are for that purpose here exhibited:

APPELLANT'S BACK LABEL.

**"LITTLE GOES FAR"**

HOW TO USE

"3 in 1" Oil

*TO CLEAN*, rub parts with soft cloth moistened sparingly with "3 in 1."

*TO POLISH (after cleaning with "3 in 1")*, rub surface until dry, with a soft, clean cloth.

IT CLEANS AND POLISHES

Producing a brilliant lustre on Bicycles, Firearms, Typewriters, Sewing Machines; Pianos, Furniture, Woodwork; Enameled, Nickeled and Varnished surfaces.

It Cleans and Removes all Residue in Gun Barrels after Shooting.

IT PREVENTS RUST

IN ALL CLIMATES

To prevent rusting or tarnishing of Nickel, Steel and Metallic surfaces leave on a thin coating of "3 in 1."

IT LUBRICATES

The Bearings and Mechanism of Bicycles, Firearms, Typewriters, Sewing Machines, Reels, Skates, Locks, Clocks, Phonographs, Musical and Scientific Instruments, and anything requiring oil.

GUARANTEED NOT TO GUM NOR HARDEN
CONTAINS NO ACIDS

APPELLEES' BACK LABEL.

# DIRECTIONS

**FOR POLISHING.**

Clean article to be polished with Big 4 and rub with a soft cloth until dry.

**To Prevent Rust.**

Apply a thin coat of Big 4 to Nickle, Steel or any metallic surface and it will leave a thin transparant finish, and will prevent rust in any climate.

**For Lubricating.**

Use sparingly of Big 4 on any and all fine machinery. Will Not Gum or get thick.

**For Cleaning Typewriters, Guns, Etc. and Removing Rust.**

Clean with Big 4, all Guns and fire arms. Will remove residue after shooting.

Other facts essential to be considered are stated in the opinion of the court. The bill was filed upon the double ground of trade-mark infringement and of unfair trade. The court below at the hearing dismissed the bill for want of equity; finding that the one trade-mark does not infringe the other, and, upon the contention of unfair competition, that it was not proven that any one had been deceived, or that there had been any attempt to deceive, or to simulate the goods of the complainant. The decree is brought here for review.

Frank F. Reed, for appellant.

Harrison Musgrave, for appellees.

Before JENKINS, GROSSCUP, and BAKER, Circuit Judges.

JENKINS, Circuit Judge (after stating the facts as above). We are to consider this case, as the bill presents it, to involve the charge both of an infringement of a trade-mark and of unfair competition in trade. The two are sometimes confounded, yet they are distinctive, and the distinction ought not to be lost sight of. A trade-mark is an arbitrary, distinctive name, symbol, or device, to indicate or authenticate the origin of the product to which it is attached. An infringement of such trade-mark consists in the use of the genuine upon substituted goods, or of an exact copy or reproduction of the genuine, or in the use of an imitation in which the difference is colorable only, and the resemblance avails to mislead so that the goods to which the spurious trade-mark is affixed are likely to be mistaken for the genuine product; and this upon the ground that the trade-mark adopted by one is the exclusive property of its proprietor, and such use of the genuine, or of such imitation of it, is an invasion of his right of property.

Unfair competition is distinguishable from the infringement of a trade-mark in this: that it does not involve necessarily the question of the exclusive right of another to the use of the name, symbol, or device. A word may be purely generic or descriptive, and so not capable of becoming an arbitrary trade-mark, and yet there may be an unfair use of such word or symbol which will constitute unfair competition. Thus a proper or geographical name is not the subject of a trade-mark, but may be so used by another unfairly, producing confusion of goods, and so come under the condemnation of unfair trade, and its use will be enjoined. The right to the use of an arbitrary name or device as indicia of origin is protected upon the ground of a legal right to its use by the person appropriating it. The doctrine of unfair competition is possibly lodged upon the theory of the protection of the public whose rights are infringed or jeopardized by the confusion of goods produced by unfair methods of trade, as well as upon the right of a complainant to enjoy the good will of a trade built up by his efforts, and sought to be taken from him by unfair methods. Whether such confusion has been or is likely to be produced by the acts charged, is a question of fact to be resolved either by evidence of actual sales of the one product for the other, of actual mistake of one for the other, of fraudulent palming off of the one for the other, or, on the other hand, failing such evidence, by comparison of the two brands to determine whether the one can be readily mistaken for the other, even by the inattentive and unobserving retail purchaser. We must therefore review this record in the two lights of alleged infringement and alleged unfair competition.

130 F.—45

1. Is the complainant's trade-mark infringed by the one adopted by the defendant?

The distinctive characteristics of the appellant's trade-mark inhere in the name "Three in One," and the picture of the figure "1" in red, upon which are superimposed in white the figure "3" and the word "in." As we observe in Pillsbury v. Pillsbury-Washburn Flour Mills Company, 64 Fed. 841, 12 C. C. A. 432, "A specific article of approved excellence comes to be known by certain catchwords easily retained in memory, or by a certain picture which the eye readily recognizes." Nothing could be simpler than the catchwords of this trade-mark, "Three in One," suggestive of the theological doctrine of the Trinity. Nothing could, we think, be more apt to win attention than the simple and attractive picture of the large figure "1" in bright red, with the white figure and letters "3" "in" superimposed upon it. These would catch the eye of the most unwary and unobservant person, and indicate the article he desired. The trade-mark of the appellees consists of the words "Big Four"—the picture of a large figure "4" in blue, superimposed upon a rectangular background in red, with lettering in blue around the four sides; the name "Big Four" being in red lettering, as contradistinguished from the black lettering of the appellant. The remaining part of the label consists of letters in red and in blue in irregular curved lines, as contrasted with the black lettering upon that of the appellant's bottle. The back label upon the appellant's bottle will be seen, by comparison of the marks, to be equally distinguishable. In the latter there are no letters or figures in red, as upon the former. Taken as a whole, we perceive no similarity between these two trade-marks that, even with the slight care which the ordinary purchaser exercises, would mislead. The one is clear, imposing, attractive. The other is ornate, involved, confusing. Nor is there idem sonans in the words "Three in One" and "Big Four," tending to confuse the unwary purchaser. The one is not suggestive of the other. They are "dissimilar in sound, appearance, and suggestion." We do not overlook the fact that the ordinary purchaser at retail is without the opportunity of comparison; but we cannot comprehend that even a careless purchaser, having in mind the catchwords "Three in One," having in mind the white letter "3" superimposed upon the red figure "1," could be confused or deceived by the package bearing the catchwords "Big Four," and the figure "4" in blue superimposed upon a red rectangle, with all the other differences in the makeup of the label. It seems to us improbable, unless by some device or fraud the one is imposed upon him for the other by a designing seller, which latter act would be involved in the question of unfair competition, not in that of infringement of trade-mark. Within our ruling in Sterling Remedy Company v. Eureka Chemical & Manufacturing Company, 80 Fed. 105, 25 C. C. A. 314, and Postum Cereal Company, Limited, v. American Health Food Company, 119 Fed. 848, 56 C. C. A. 360, we are unable to consider the term "Three in One" to be infringed by the term "Big Four," or that the coloring or dress of the figure "4" in the latter is suggestive of the figures "3" and "1" in the former. In the case first cited we held the term "No-To-Bac" to be not infringed by the term "Baco-Curo," and in the latter case that the term "Grape-Nuts" is not infringed by

the term "Grain-Hearts." In each of these cases the name complained of is more nearly suggestive of the trade-mark claimed to be infringed than in the case here. The term "Big Four" is the popular name of a railway, associated in the popular mind with that road. It is wholly wanting in suggestion of "Three in One." We are constrained to the conclusion that the appellant's trade-mark is not infringed by the device complained of.

2. Have the appellees been guilty of unfair competition, resulting in confusion of goods, to the injury of the public, or to the invasion of the appellant's legal rights?

The affirmative of this proposition is asserted by the appellant, and it rests with it to prove that affirmative satisfactorily. It is asserted that unfair competition is shown in several particulars: (a) That for many years prior to the adoption of the "Big Four" label, the appellees had manufactured and marketed several kinds of oil under different brands and distinctive names, and in packages altogether distinct from the appellant's, and adopted the one in question in imitation of the appellant's. (b) That the appellees adopted the device "Big Four" expressly to compete with the product "Three in One"; that the appellees were known throughout the trade as distributers of the appellant's product "Three in One," and practically occupied some sort of trust relation to the appellant. (c) That the appellees' circular was in part, at least, copied from, and was an imitation of, the appellant's circular; that the color and the odor of the two products are the same, and the identity was so caused for the purpose of deception. (d) That the product "Big Four" at once became known as "Four in One," and so has caused confusion in goods.

(a) With respect to the first of these assertions it is sufficient to say that while the label "Big Four" is distinctive, and perhaps widely so, from the numerous labels theretofore used by the appellees during 20 years of business, the previous labels are also easily distinguishable from each other. It is the purpose of the originator of a label to produce one which is in a marked degree dissimilar from any other; one that shall catch the eye and remain in the memory of a proposing purchaser; a label that shall stand apart by itself, distinguished from and unlike any other. It must also be borne in mind that the quality of this oil, "Big Four," was of a different grade and of higher excellence than any other oil theretofore manufactured and put upon the market by the appellees. It was compounded by a secret formula known only to them. It was natural, therefore, and proper, that they should seek an entirely distinctive brand to mark that particular quality of oil. We perceive nothing in this circumstance indicating fraud, or disposition to obtain advantage of the appellant by unfair means.

(b) It is shown that the name "Big Four" was selected because the oil was contained in a four-ounce bottle, and because the name was popularly known at the West in connection with a railway. It thus identifies the particular oil by the size of the bottle containing it, and attracts attention by giving it the catch name of a popular railway. If adopted for the purpose of giving popularity to the product, and enabling the appellees to compete with the product of the appellant, that is not objectionable in morals or in law, unless, by reason of their re-

lations to the appellant, the appellees are bound to refrain from such competition. The law of unfair trade has never gone to the length of preventing fair competition in trade. The law seeks only to restrain fraudulent practices inducing confusion of goods and deception of the public. There is nothing in the relation of these parties which prohibited such competition. The Excelsior Supply Company was a customer of the appellant, buying largely of its product "Three in One." It had special terms from the appellant, as had all its large customers; but that course of business created no trust relation between them, and constitutes no objection to competition.

(c) With respect to the question of alleged identity of color and odor, we have little difficulty. Oil of the same odor had been manufactured and sold by the appellees for many years. A large number of oils have the same color. It is the ordinary color for oils of that character. The odor is caused by the oil of citronella, used to suppress the odor of the oil in its original condition. Its use is common, and had been for many years. It had been used by the appellees for the like purpose for upwards of 20 years.

Coming next to the circular: The arrangement of the folders is quite distinct. On the first page of the appellant's circular is the figure of a woman standing at a sewing machine with upraised hand pointing to a bottle of "Three in One," and the seven reasons stating the supposed excellence of that oil are printed thereon. All this is in prominent red print. No such, or any, picture appears upon the appellees' circular. On the fourth page of the appellant's circular are two parallelograms, with red ornamental border and white center, and upon the latter is printed, in large letters in red, "IT'S OIL, RIGHT." No such, or any, picture appears upon the appellees' circular. The third and fourth pages of appellant's circular contain pictures in parallelograms, irregularly distributed over the sheet, of a clock, a reel, a bicycle, a piano, and other articles and machines, with letterpress indicating the supposed excellent uses of the oil. At the right of the fourth page is a picture of the bottle "Three in One," with the labels upon it. The appellees' circular is composed of two pages, having at the right of the first page a representation of a bottle of "Big Four" oil, and a blank underneath it, with the heading, "For sale by." It then has cuts of different instruments upon which the oil can be used profitably, and with its uses specified. Three of these cuts are identical with the cuts in the appellant's circular, and were taken from its circular. Of the 19 cuts in the appellees' circular, 16 were obtained from catalogues of traders in Chicago. All these cuts were of the ordinary trade forms, and the record discloses from whom they were obtained. The witness who got up this circular testifies that he took the three from the appellant's circular, supposing that they were public property, in the same way he took the cuts from other circulars. With the exception noted, the circulars are dissimilar. The arrangement of the different cuts is decidedly different from that of the appellant. They are not in parallelograms irregularly distributed. They are not in parallelograms at all. They are placed in regular columns from the top to the bottom of the sheet; the first being placed at the left and the second at the right

of the printed matter, and so on throughout the circular. The appellant wraps its circular around the bottle in the carton. That is not done by the appellees. They use their circular simply as an advertisement, sending it to the jobbers. It is nothing that the buyer at retail receives in purchasing the package. There is little or no danger that the jobber or retailer purchasing goods in large quantities would be deceived by a false brand. He not only knows the article he wishes to purchase, but is careful to ascertain if the article shown him be the genuine. It is the casual inattentive purchaser of a single package who is subject to be deceived, and such a one could not possibly be deceived by this circular, for he does not receive it, if in any respect the circular may be said to be deceptive. If any just criticism may be indulged with respect to the copying of the three cuts of the appellant's circular, the act can have no misleading effect, or induce one to mistakenly receive the one product for the other, and ought not, therefore, to avail, standing alone, to sustain the charge of unfair competition. Potter Drug & Chemical Corp. v. Pasfield Soap Company (C. C.) 102 Fed. 490.

A single word with respect to the carton will suffice. A carton of the same shape and construction has been used by the appellees for 15 years. Such cartons were well known and quite common at the time the appellant adopted them. The lettering and coloring of the two cartons used respectively by the appellant and appellees were as different and distinct as the printed labels upon the bottles.

(d) Has the product "Big Four" become known as "Four in One," and has it been sold as the product "Three in One"?

If the appellees had sanctioned the use of that designation for their product, and it had become so known, or if without their sanction their product had come to be so designated, we might be inclined to say that the use of the numerals should cease, that confusion might not result. But has it in fact so become known? We have given to the evidence on this point a careful scrutiny to ascertain if there be any just foundation for the charge. The evidence of the appellant upon this branch of the case rests upon the testimony of a single witness, a young man of 21 years of age, in the service of one dealing in hardware specialties, who sold the product of the appellant, but not that of the appellees. About two hours before giving his testimony, he was ordered to, and did, meet Mr. George W. Cole, president of the appellant, upon a street corner in the city of Chicago, and was directed by him to go to certain places and ask for "Four in One" oil, and, if they offered anything else, not to take it. He states that he went to Rothschild's and asked for a bottle of "Four in One" oil, and was given a bottle wrapped in a package, which he did not examine; that it was given to him by a female clerk; that it was wrapped up by her; and that, if he had examined it, he could not have told what it was. That he went to the Excelsior Supply Company and asked for a half a dozen large and half a dozen small bottles of "Four in One," and was given the goods with a bill for them which distinctly stated it was "Big Four" oil. He also stated that he had heard a female clerk at The Fair talk about "Four in One" oil about a month before his examination; that in June there were six women selling goods in that department, but at

the time of his examination there were only two, the force being decreased in number because of the discontinuance of a lamp .demonstration that was being had there in June. The witness went with Mr. Robie, one of the appellees, to the department of The Fair where such goods were sold, and where he had heard the expression "Four in One." On his return he testified that the woman whom he had heard speak of "Four in One" oil was not there. At this point he was asked if, on the occasion of his visit to The Fair in company with Mr. Robie, he inquired if they had "Four in One" oil, and he said reluctantly—desiring first to have the advice of counsel for appellant whether he should answer—that he had so done at the request of Mr. Robie, and the saleswoman replied "No." With respect to the package he obtained at Rothschild's—the red package, as it is called—it is very different from the packages of the appellees here complained of. With respect to the transaction of this witness at the Excelsior Supply Company, two clerks of that company, testifying the day after the transaction, stated that the witness for the appellant called and asked for "Four in One" oil, and they told him they had no such thing, but had "Big Four," if that was what he wanted, to which he replied, "That is all right," and the witness wrapped up the bundle, and he paid for it, received the bill, and walked away. We deem this evidence on the part of the appellant wholly insufficient to base thereon a finding of unfair trade, or to prove that the product of the appellees has come to be generally known as "Four in One." It is remarkable, if it was a fact that the product had come to be generally so known, that no dealer in it and no purchaser of it could be found to so testify, and that we should be asked to base a finding of unfair trade in that respect upon the above-recited testimony of the young man who was employed for the occasion. We think the appellant has wholly failed to make out a case showing even a probability of confusion of goods by reason of the particular designation of the two labels. There is not an atom of evidence that any person has ever been deceived. There is, as we have stated in considering the first branch of this case, upon the face of these labels no probability that any one exercising the care that even an inattentive purchaser gives to his purchases would be deceived. This court has been at all times zealous in respect of the use of trademarks and labels, to restrain competitors from all unfairness in competition producing confusion of goods; but we are not disposed to carry the principles of the law so far that one trader may have a monopoly of all numerals, or be enabled to throttle the trade of all competitors.

Some evidence has been given by the appellant—quite inconclusive, as we think—indicating an intention on the part of the appellees in getting up this label "Big Four," and in prosecuting the business of the sale of that product, to enter into competition with them by selling it at a less price to the jobber, inducing them to substitute their product for that of the appellant, with the expectation of larger gains, and of imitating as closely as they safely could the appellant's labels and packages. We do not deem it necessary to consider this evidence, for, as we think, if the appellees ever designed to obtain an unfair advantage of the appellant, they have, as stated in Kann v. Diamond Steel Company, 32 C. C. A. 321, 89 Fed. 706, "never used any means calculated

to accomplish it, and they adopted those admirably suited to defeat it. Their intention therefore becomes immaterial." An intention to injure, if no injury be done, constitutes no ground for relief. Hopkins on Unfair Trade, § 76; Centaur Company v. Marshall, 38 C. C. A. 413, 97 Fed. 785; Postum Cereal Company, Ltd., v. American Health Food Company, 56 C. C. A. 360, 119 Fed. 848, 852.

We cannot better conclude this opinion than to use the language of Mr. Justice Brewer in Lorillard Co. v. Peper, 30 C. C. A. 496, 86 Fed. 956, 960:

"The difference is such that the eye will take it in at a moment's glance. Summing it all up, while there are certain minor points of resemblance which have been forcibly urged upon our attention by the counsel for plaintiff, yet, looking at the two packages with their labels—taking the tout ensemble—it appears to us clear that they are so essentially different that no one of ordinary intelligence, desiring to buy the one kind of tobacco, would be misled into buying the package of the other."

The case of Coats v. Merrick Thread Company, 149 U. S. 562, 13 Sup. Ct. 966, 37 L. Ed. 847, is also instructive upon this question.

The decree will be affirmed.